UNITED STATES of America, Plaintiff,

v.

Barbara BISSELL, Defendant.

Criminal No. 95–539 (AJL).

United States District Court, D. New Jersey.

Jan. 29, 1997.

**905**

Faith S. Hochberg, United States Attorney, Stuart A. Rabner, Perry Carbone, Asst. U.S. Attys., Newark, NJ, for U.S.

Rita E. Donnelly, South Orange, NJ, for Barbara J. Bissell.

Peter B. Bennett, Bennett & Leahey, Red Bank, NJ.

## OPINION

LECHNER, District Judge.

Defendant Barbara Bissell ("Barbara Bissell") and her husband Nicholas Bissell ("Nicholas Bissell") (collectively the "Defendants") were charged in a second superseding indictment (the "Second Superseding Indictment"), filed on 14 March 1996. The facts relating to the numerous charges brought against Defendants are set forth in a decision regarding the pre-trial motions of Defendants and the sentencing of Barbara Bissell. *See United States v. Bissell,* 954 F.Supp. 841, 851–858 (D.N.J.1996) (*"Bissell I"*).

Barbara Bissell was named in thirteen counts in the Second Superseding Indictment; she was named in counts 12 through 16, which charged Defendants with mail fraud in connection with their operation of the Bedminster Amoco Gas Station, located in Somerset County, New Jersey (the "Bedminster Station"). Second Superseding Indictment, ¶ 4, at 12. Count 23 charged Defendants with conspiracy to "defraud the United States and the Internal Revenue Service in the ascertainment, computation, assessment, and collection of income taxes." *Id.,* ¶ 2, at 29. Counts 24 through 27 charged Defendants with tax evasion for the years 1991 to 1994 for failing to report money they embezzled from the Bedminster Station on their joint personal tax returns. *Id.,* ¶ 3, at 33. Counts 28 through 30 charged Barbara Bissell with knowingly and wilfully signing false U.S. Partnership and Corporate Income Tax Returns for the Bedminster Station for the tax years 1991 through 1993, in violation of 26 U.S.C. § 7206(1) ("Section 7602(1)").

On 31 May 1996, Barbara Bissell was convicted by a jury of all counts charged against her in the Second Superceding Indictment.

On 6 December 1996, she was sentenced to a term of 27 months imprisonment. This matter is now before the court upon a motion, filed on 6 January 1997, for an order "maintaining [Barbara Bissell] on a personal recognizance bond release or on bail pending her appeal to the United States Court of Appeals for the Third Circuit...." *See* Notice of Motion For Bail Pending Appeal (the "Motion for Bail Pending Appeal").[1] For the reasons set forth below, the Motion for Bail Pending Appeal is denied.

*Discussion*

A. *Bail Pending Appeal*

The Bail Reform Act of 1984 (the "1984 Act") provides, in relevant part:

[T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) *that the appeal is not for the purposes of delay and raises a substantial question of law or fact* likely to result in—

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b) ("Section 3143(b)") (emphasis added).

Section 3143(b) creates a presumption against post-conviction release pending appeal. *See United States v. Miller*, 753 F.2d 19, 22 (3d Cir.1985) ("The [1984 Act] was enacted because Congress wished to reverse the presumption in favor of bail that had been established under the prior statute, the Bail Reform Act of 1966."); *United States v. Mathis*, Crim. No. 91–595–10, 1994 WL 22303, at *2 (E.D.Pa. 25 Jan. 1994).

The Circuit has explained:

Once a person has been convicted and sentenced to jail, there is *absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances.* First and most important, the conviction, in which the defendant's guilt of a crime has been established beyond a reasonable doubt, is presumably correct in law, a presumption factually supported by the low rate of reversal of criminal convictions in the Federal system. Second, the decision to send a convicted person to jail and thereby reject all other sentencing alternatives, by its very nature includes a determination by the sentencing judge that the defendant is dangerous to the person or property of others, and dangerous when sentenced, not a year later after the appeal is decided. Third, release of a criminal defendant into the community, even after conviction, destroys whatever deterrent effect remains in the criminal law.

*Miller*, 753 F.2d at 22 (quoting H.Rep. No. 907, 91st Cong., 2d Sess. 186–87 (1970) (emphasis added)). Accordingly, under the 1984 Act, a defendant has the burden of establishing

(1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;

(2) that the appeal is not for the purpose of delay;

(3) that the appeal raises a substantial question of law or fact; and

(4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

---

1. Barbara Bissell submitted: Letter Memorandum of Law In Lieu of Brief (the "Moving Brief"), dated 3 January 1997; Letter Memorandum of Law in Lieu of Reply Brief (the "Reply"); Certification of Barbara Bissell (the "Bissell Cert."); and Certification of Rita E. Donnelly, Esq. (the "Donnelly Cert."). The Government submitted: Memorandum of Law of the United States In Opposition to Defendant Barbara Bissell's Motion for Bail Pending Appeal (the "Opposition Brief"). Argument was heard on 27 January 1997.

*United States v. Messerlian,* 793 F.2d 94, 95–96 (3d Cir.1986) (emphasis added) (quoting *Miller,* 753 F.2d at 24); *see United States v. Smith,* 793 F.2d 85, 87 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 832 (1987).

### 1. *Risk of Flight/Danger to Community*

▆▆ The factors to be considered in assessing the risk of flight include: (1) the nature and circumstances of the offense, (2) the defendant's family ties, (3) the defendant's employment status, (4) the defendant's financial resources, (5) the defendant's character and mental condition, (6) the length of defendant's residence in the community, (7) any prior criminal record and (8) any flight or failures to appear in court proceedings prior to or during the time of trial. *United States v. Bertoli,* 854 F.Supp. 975, 1158 (D.N.J.), *aff'd in part, sentence vacated in part on other grounds,* 40 F.3d 1384 (3rd Cir.1994). When assessing danger to the community, " 'danger may, at least in some cases, encompass pecuniary or economic harm.' " *Id.* at 1161 (quoting *United States v. Reynolds,* 956 F.2d 192, 192 (9th Cir. 1992)).

In the instant case, there is no indication Barbara Bissell poses a physical danger to the community or a risk of flight.

### 2. *Purposes of Delay*

▆▆ The belated filing, insubstantial nature and lack of merit of the Motion for Bail Pending Appeal warrants the conclusion the motion has been brought for the purpose of merely delaying the commencement of Barbara Bissell's sentence.

As ·indicated, on 31 May 1996, Barbara Bissell was convicted of all charges brought against her in the Second Superseding Indictment. On 6 December 1996, a sentencing hearing was held (the "Sentencing Hearing"). At the Sentencing Hearing, Barbara Bissell was ordered to surrender to commence serving her sentence on 30 January 1997. Sentencing Hearing Tr. at 48. Barbara Bissell filed a notice of appeal on 12 December 1996. The *Bissell I* opinion, dealing with all of the pre-trial motions and the sentencing of Barbara Bissell, was filed on 13 December 1996.

Barbara Bissell waited until the close of business Friday, 3 January 1997, to submit the Motion for Bail Pending Appeal, which was not filed until 6 January 1997.[2] Her belated filing of the instant motion required scheduling adjustments so that opposition from the Government and a reply from Barbara Bissell could be received and considered and the motion decided before 30 January 1997.

The Motion for Bail Pending Appeal is not a substantial undertaking. The Moving Brief is a fifteen page letter memorandum. As is discussed below, the arguments contained in the Moving Brief are not supported by the evidence. The Motion for Bail Pending Appeal, moreover, does not present any substantial questions of law or fact warranting a continuation of bail pending appeal. Counsel for Barbara Bissell misstates the evidence and makes frivolous legal arguments based upon her misstatement of the evidence. The Motion for Bail Pending Appeal appears to have been brought for the purpose of delaying the commencement of Barbara Bissell's sentence.

The conclusion the Motion for Bail Pending Appeal was brought for the purposes of delay is further supported by counsel's request for an adjournment during argument.

---

**2.** In the Moving Brief, Barbara Bissell complains about a "media blizzard" regarding Defendants' case. This argument is ironic in light of counsel for Barbara Bissell's relationship with the press. For example, the Motion for Bail Pending Appeal was not filed until 6 January 1997. On 5 January 1997, two newspapers, the Star–Ledger and The Record, ran stories regarding the motion. *See* Steve Chambers, *Prosecutor's widow wants jail postponed,* Star Ledger (Newark, New Jersey), 5 January 1997; *Bissell's Wife Seeking Delay In Prison Term,* The Record (Northern New Jersey), 5 January 1997. A review of the articles reveals that counsel released the Moving Brief to the press, prior to it being filed with the court. The Record's article reported that an unnamed prosecutor on the case had been contacted regarding the motion but had "declined comment" because the Government had not yet received the motion. *Bissell's Wife Seeking Delay In Prison Term,* The Record (Northern New Jersey), 5 January 1997. These press releases and other communications between counsel for Barbara Bissell and the media are surprising in light of counsel's argument regarding the excessive media coverage.

As mentioned, Barbara Bissell was sentenced on 6 December 1997 and filed her notice of appeal on 11 December 1997. In a letter, dated 24 December 1997, counsel for Barbara Bissell informed counsel for the Government of her intention to seek a two week adjournment. Apparently, despite having submitted an *in forma pauperis* application for her appeal, Barbara Bissell has privately "engaged" new attorneys. *See* letter of Rita E. Donnelly, dated 24 January 1997; 27 January 1997 Tr. at 3. This last minute request for an adjournment supports the conclusion the instant motion was brought merely to delay the commencement of Barbara Bissell's sentence.

### 3. *Substantial Question of Law or Fact*

The Circuit has held a "substantial question" is one which is "fairly debatable." *Smith,* 793 F.2d at 89–90 (adopting standard articulated in *United States v. Handy,* 761 F.2d 1279, 1281–82 (9th Cir.1985), and rejecting "close question" formulation stated in *United States v. Giancola,* 754 F.2d 898, 901 (11th Cir.1985), *cert. denied,* 479 U.S. 1018, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986)); *see Messerlian,* 793 F.2d at 96; *Bertoli,* 854 F.Supp. at 1162. A defendant must show not only that the issues presented on appeal are "debatable among jurists of reason," but also that they are "significant." *Smith,* 793 F.2d at 89. "Under the [1984 Act], after first making the findings as to flight, danger, and delay, a court must determine that the question raised on appeal is a 'substantial' one, i.e. it must find that the significant question at issue is one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." *Miller,* 753 F.2d at 23.

"A question of law or fact may be substantial but may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to

have been insufficiently preserved." *Miller,* 753 F.2d at 23. In order for a question to be "significant" in a particular case, it must be "so integral to the merits of the conviction on which a defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Id.*

Barbara Bissell raises three issues which she contends are "important" for the purposes of Section 3143(b). Specifically, she contends the court erred: (1) in denying Barbara Bissell's pretrial severance motion, (2) in instructing the jury on "deliberate ignorance," and (3) in its refusal to appoint Barbara Bissell's chosen counsel under the Criminal Justice Act (the "CJA"). As is discussed below, Barbara Bissell has failed to carry her burden of establishing a substantial question of law or fact. Accordingly, the Motion for Bail Pending appeal is denied. *See Messerlian,* 793 F.2d at 95–96; *Bertoli,* 854 F.Supp. at 1158.

### A. *Severance*

As indicated, Barbara Bissell argues the court erred in denying her pretrial severance motion (the "Severance Motion"). Moving Brief at 3. Barbara Bissell conclusorily argues the "nature, extent, and the potential for a negative emotional atmosphere at the trial of the charges against Nicholas L. Bissell, Jr. were manifest and known at the time of trial" and that the Severance Motion should have been granted "to avert a 'manifestly unfair trial.'" *Id.* at 6–8. In the alternative, she argues "the public corruption charges against Nicholas Bissell should have been severed" from the charges against both Defendants. *Id.* at 8. Barbara Bissell argues that because "it is more likely than not that [she] will prevail on this issue on appeal ... bail pending appeal should be granted."[3] *Id.* at 9. Barbara Bissell's current argu-

---

3. In making her argument, counsel appears to imply that the likelihood of success of Barbara Bissell's appeal is significant to the Motion for Bail Pending Appeal. The Circuit has held that the 1984 Act does not require such a determination:

> [T]he phrase [, in the 1984 Act,] "likely to result in reversal or an order for a new trial" cannot reasonably be construed to require the

district court to predict the probability of reversal. The [F]ederal courts are not to be put in the position of "bookmakers" who trade on the probability of ultimate outcome. Instead, that language must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal.

*Miller,* 753 F.2d at 23.

ment, that severance of Defendants' cases was required, is little different than her argument made in the Severance Motion. *See Bissell I,* 954 F.Supp. at 871–75.

As Barbara Bissell concedes, Moving Brief at 8, the Second Superseding Indictment was in compliance with Rule 8 of the Federal Rules of Criminal Procedure ("Rule 8").[4] Barbara Bissell argues her trial should have been severed from Nicholas Bissell's pursuant to Rule 14 of the Federal Rules of Criminal Procedure ("Rule 14"). Rule 14 authorizes a trial court to sever counts or defendants where, despite an indictment's technical compliance with Rule 8, joinder would result in a "manifestly unfair trial." *Bissell I,* 954 F.Supp. at 871 (citing *United States v. Giampa,* 904 F.Supp. 235, 265 (D.N.J.1995), *aff'd,* 107 F.3d 9, No. 96–5059 (3d Cir.1997); *United States v. Cannistraro,* 800 F.Supp. 30, 87 (D.N.J.1992); *United States v. Vastola,* 670 F.Supp. 1244, 1261 (D.N.J.1987) (citing *United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir.1981))). Severance pursuant to Rule 14 is within the discretion of the trial court. *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993) ("Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts").

A defendant bears a "heavy burden" when moving for severance under Rule 14. *See United States v. Eufrasio,* 935 F.2d 553, 568 (3d Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *United States v. Sandini,* 888 F.2d 300, 305 (3d Cir.1989), *cert. denied,* 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990); *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). Mere allegations of prejudice are insufficient to meet this burden. *Giampa,* 904 F.Supp. at 265. Defen-

dants must "pinpoint 'clear and substantial prejudice' resulting in an unfair trial." *United States v. McGlory,* 968 F.2d 309, 340 (3d Cir.) (quoting *Eufrasio,* 935 F.2d at 568), *cert. denied,* 506 U.S. 956, 113 S.Ct. 415, 121 L.Ed.2d 339 (1992); *Giampa,* 904 F.Supp. at 265; *see also United States v. Wright–Barker,* 784 F.2d 161, 175 (3d Cir.1986). Defendants are not entitled to severance "merely because they may have a better chance of acquittal in separate trials." *Zafiro,* 506 U.S. at 540, 113 S.Ct. at 938; *McGlory,* 968 F.2d at 340; *Giampa,* 904 F.Supp. at 265.

"The introduction of evidence more damaging to one defendant than another does not entitle the seemingly less culpable defendant to a severance." *McGlory,* 968 F.2d at 340 (citing *United States v. De Peri,* 778 F.2d 963, 983 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986)); *Smith,* 789 F.2d at 206; *Adams,* 759 F.2d at 1112; *United States v. Dansker,* 537 F.2d 40, 62 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). "If that were the case, a joint trial could rarely be held." *Dansker,* 537 F.2d at 62. The mere introduction of evidence regarding crimes charged only against Nicholas Bissell, moreover, does not entitle Barbara Bissell to a separate trial. *McGlory,* 968 F.2d at 340 (citing *United States v. Rocha,* 916 F.2d 219, 228–29 (5th Cir.1990), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991)).

A risk of prejudice may often be cured with an appropriate jury instruction. *Zafiro,* 506 U.S. at 540, 113 S.Ct. at 938. "[J]uries are presumed to follow their instructions." *Id.* The inquiry is whether the jury could reasonably have been expected to compartmentalize the evidence against Barbara Bissell. *McGlory,* 968 F.2d at 340 (citing *Eufrasio,* 935 F.2d at 568); *Giampa,* 904 F.Supp. at 266.

Barbara Bissell's current argument is less compelling than her argument was in the Severance Motion. The Severance Motion

---

4. Rule 8 permits two or more offenses to be charged in the same indictment ... if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a)

(joinder of offenses). Rule 8 further provides two or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Fed.R.Crim.P. 8(b) (Joinder of Defendants).

relied heavily on the argument that Nicholas Bissell would provide exculpatory testimony only if severance was granted. *Bissell I*, 954 F.Supp. at 871. Barbara Bissell argued in the event of a joint trial, Nicholas Bissell would exercise his Fifth Amendment right not to testify. *Id.* She argued Nicholas Bissell's " 'testimony would be exculpatory with respect to the role [she] played in regard to tax returns and payments made from the account of Bissell's, Inc.' " *Id.*

At trial, Nicholas Bissell did testify and was subject to cross-examination by counsel for Barbara Bissell. *Bissell I*, 954 F.Supp. at 871. "As the trial demonstrated, Nicholas Bissell was neither an effective nor a credible witness." *Id.*

Barbara Bissell conclusorily argues she was prejudiced by the joint trial. Moving Brief at 8. She argues her trial was tainted by the "disgust engendered toward her husband by proof of despicable conduct such as ordering the tailing of a Superior Court judge...." *Id.* She argues the charges of "egregious" conduct brought solely against Nicholas Bissell "had the special ... ability to poison the courtroom atmosphere and inflame the jury to a degree that curative instructions could not correct." Moving Brief at 4. This conduct included:

a) Failing to disclose a material conflict of interest ... with an attorney who represented clients in an adversarial capacity with the Somerset County Prosecutor's Office.

b) [Nicholas Bissell's] threatening to plant cocaine in his distributor's car and having him arrested and prosecuted by the Somerset County Prosecutor's Office; and by

c) Failing to act honestly in the conduct of his office with respect to a [F]ederal civil rights proceeding ... in his capacity as the Somerset County Prosecutor and in his personal capacity by obstructing justice and giving perjured testimony.

Moving Brief at 5. Barbara Bissell also argues the evidence showing Nicholas Bissell engaged in criminal solicitation of a vendor of the Prosecutor's Office to prepare fraudulent tax return prejudiced her trial. *Id.*

As is more fully explained in *Bissell I*, Barbara Bissell's argument for severance of her case from that of her husband was, and is, without merit. The Second Superseding Indictment charged Barbara Bissell, in conjunction with Nicholas Bissell, "routinely embezzled cash from the Bedminster [S]tation" without informing their partner Thomas "Buddy" Thornburg ("Buddy Thornburg"). Second Superseding Indictment, ¶ 9, at 13. Barbara Bissell's role in the fraud was far from minor; she was a voluntary, full partner in the criminal conduct. She was an officer of the corporation which owned the franchise to operate the Bedminster Station and was the bookkeeper for the Bedminster Station, maintaining the station's checkbook and payroll records. Second Superseding Indictment, ¶ 2, at 12. She, moreover, signed false corporate and personal tax returns relating to income derived from the Bedminster Station. *Id.,* ¶¶ 1–3, at 33–34; 1–4, at 35–36. Barbara Bissell also paid personal expenses with the Bedminster Station Partnership's funds. *Id.,* ¶ 8, at 13; ¶ 4, at 29. As well, she accompanied her husband on weekends when he visited the Bedminster Station to skim money.

As indicated, Defendants were charged in conjunction with fraudulently running the Bedminster Station and committing tax evasion. Accordingly, the separate trials would involve many of the same witnesses and much of the same documentary proofs. This duplication of effort was neither justified nor necessary.

Many of the charges directed solely at Nicholas Bissell were closely related to the charges against Barbara Bissell. Despite Barbara Bissell's conclusory argument to the contrary, a separate trial would have required a duplication of effort and a waste of resources.

For example, Nicholas Bissell was convicted of knowingly and wilfully devising and executing a scheme to defraud "the citizens of the County of Somerset, the County of Somerset itself, and the State of New Jersey to their right to the honest and faithful services of their chief law enforcement officer, from 18 November 1988 through 28 September 1995," in violation of 18 U.S.C. § 1341.

*See Bissell I,* 954 F.Supp. at 851. The fraudulent operation of the Bedminster Station was charged as part of the conduct which compromised Nicholas Bissell's "ability to faithfully, justly and impartially" execute his duties as Somerset County Prosecutor. Second Superseding Indictment, ¶ 11, at 8. As mentioned, Barbara Bissell was a voluntary, full partner in the criminal conduct.

As part of this scheme, the Government proved Nicholas Bissell failed to disclose a business relationship with an adversary of the Somerset Prosecutor's Office. *Bissell I,* 954 F.Supp. at 851. This business relationship involved the operation of the Bedminster Station. Nicholas Bissell was also charged with threatening to plant cocaine on the gasoline distributor of the Bedminster Station. *Id.* at 852. The threat was made because of a business dispute regarding the operation of the Bedminster Station and the continuation of the franchise. *Id.*

As indicated, Barbara Bissell was convicted of mail fraud and tax evasion in connection with the operation of the station. The charges against Nicholas Bissell in counts 1–11 of the Second Superseding Indictment were accordingly related to the charges against Barbara Bissell. Nicholas Bissell's criminal involvement with the Bedminster Station was central to the charges against him in counts one through eleven. Accordingly, the separate charges against Nicholas Bissell were connected with the charges against Defendants as well as those exclusively against Barbara Bissell. Barbara Bissell's argument that severance would not have impacted upon judicial economy, Moving Brief at 8, is without basis.

Other crimes for which Nicholas Bissell was convicted related to charges against Barbara Bissell. For example, count 22 charged Nicholas Bissell with making false statements to Federal Agents. Second Superseding Indictment, ¶¶ 1–9, at 27–28. Nicholas Bissell made these statements after Defendants' home was searched and more than $9,000 in cash, belonging to Barbara Bissell, was discovered. *Id.,* ¶ 4, at 27. Barbara Bissell also insisted on the opportunity to speak to the several Federal Agents and made statements not dissimilar to those made by her husband. As indicated below, many of the statements made by Barbara Bissell to Federal investigators were misleading and/or patently false. Nicholas Bissell's statements were made with the purpose of covering up Defendants' common scheme to defraud Thornburg, as were Barbara Bissell statements. Second Superseding Indictment, ¶ 9 at 28.

Count 17, which charged Nicholas Bissell with fraud on the investors of the Somerset Amoco, located in Somerset County, New Jersey (the "Somerset Station"), involved a similar course of conduct and dealing as counts 12–16. The Somerset Station, moreover, had made the lease payments on a Mercedes–Benz automobile which had been driven by Barbara Bissell. Trial Tr. at 1488.

Counts 20 and 21 charged Nicholas Bissell with obstruction of justice and concerned his role in the destruction of a police report and his perjured testimony in connection with a civil action in which he was named as a defendant. These charges were not related in any way to Barbara Bissell's criminal conduct. These charges were clearly distinct; there is no reference to Barbara Bissell in the Second Superseding Indictment concerning these charges. At trial, the Government made no reference to Barbara Bissell in connection with these distinct charges against Nicholas Bissell.

The evidence and charges against Barbara Bissell were closely connected to and intertwined with the evidence and charges against Nicholas Bissell. Prior to trial, it was determined a joint trial would not (and did not) prejudice Barbara Bissell. As indicated, any risk of prejudice caused by the joint trial was avoided by an appropriate instruction. The jury was cautioned:

> Each count of the indictment charges a separate offense and each count and the evidence pertaining to it must be considered separately.
>
> The fact that you may find a defendant guilty or not guilty of one of the counts should not control your verdict as to any other count charged.

*Similarly, you are to consider each defendant separately and the evidence as to each defendant separately.*

Trial Tr. at 2960–61 (emphasis added). The jury instructions were carefully worded to stress the jury's obligation to consider the evidence against each defendant separately. At the conclusion of the jury instructions the jury was again reminded of their duty "to consider each count and each defendant separately...." *Id.* at 3038.

The possibility the jury would be influenced by the presence of Nicholas Bissell as a defendant was explored during jury selection. Potential jurors were asked a series of questions regarding their prior knowledge of the facts of the case or Defendants, particularly Nicholas Bissell.

Number one, other than what you have head in this courtroom today, do any of you know anything about or have any of you read or heard anything about this case or have you spoken about this case?

Number two, if so, have you formed any opinions concerning this case?

\* \* \* \* \* \*

Number five, have you had any dealings with the County of Somerset or the Somerset County Prosecutor's Office and if so, is there anything about that which would prevent you in any way from being fair and impartial in this case?

Number six, are you award of any actions taken by Mr. Nicholas Bissell in his capacity as prosecutor of Somerset County and if so, is there anything about that which would prevent you form being fair and impartial in this case?

Number seven, will the fact that Nicholas L. Bissell, Jr. served as County prosecutor for Somerset County prevent you from being fair and impartial to both the United States and the defendants in your consideration of the evidence to be presented in this case?

Number eight, have you or has any member of your immediate family lived in Somerset County within the past ten years?

Trial Tr. at 55–56. The juror's answers to the above-quoted questions revealed they had not been influenced by the "media blizzard" Barbara Bissell complains of in the Moving Brief. Moving Brief at 4. The jurors' answers, moreover, demonstrated they were neither prejudiced nor predisposed in light of the pretrial publicity or Nicholas Bissell's former position as Somerset County Prosecutor. Significantly, Barbara Bissell did not object to the adequacy of the questions or otherwise during jury selection.

Barbara Bissell has not raised a "substantial question of law or fact" in her conclusory argument. On the facts alleged in the Pretrial Severance Motion, it was not reasonable to find Barbara Bissell would be prejudiced by a "spillover" of evidence against Nicholas Bissell, or that a joint trial would have been "manifestly unfair" to her. Aside from her speculation that such spillover may have occurred, Barbara Bissell has not demonstrated she was prejudiced in any manner. Accordingly, she has failed to "pinpoint 'clear and substantial prejudice'" resulting from the joint trial. *McGlory,* 968 F.2d at 340. No such prejudice, moreover, was apparent during the trial.

B. *The Deliberate Ignorance Instructions*

 Barbara Bissell vaguely argues it was error to give *"the* deliberate ignorance charge." Moving Brief at 9 (emphasis added). In fact, deliberate ignorance instructions (the "Deliberate Ignorance Instructions") were given with regard to both the mail fraud and tax evasion charges. Barbara Bissell argues it was error to give the Deliberate Ignorance Instructions, based upon the facts of the case. This argument is factually and legally without merit. The arguments made by counsel for Barbara Bissell are frivolous; her misrepresentation of the evidence in the instant case, moreover, is improper.

As is set forth below, contrary to her argument, counsel for Barbara Bissell did not distinctly state an objection to the giving of the Deliberate Ignorance Instructions. As indicated, aside from a passing comment regarding the propriety of giving one of the proposed instructions on deliberate ignorance, counsel did not object to the giving of the instructions. Instead, she proposed mi-

nor changes to the language that were confusing and not necessary.

The Deliberate Ignorance Instructions, moreover, were proper and supported by the evidence. The record is not only replete with evidence supporting the Deliberate Ignorance Instructions, the record also established Barbara Bissell knowingly participated in the illegal conduct for which she was convicted.

Barbara Bissell's argument the evidence did not support giving the Deliberate Ignorance Instructions is surprising in light of counsel's comments before sentencing that Barbara Bissell had accepted responsibility for her actions. Prior to sentencing, counsel argued the sentence should be adjusted downward because Barbara Bissell had " 'accepted responsibility for her *deliberate ignorance* of facts of which she should have been aware.' " *Bissell I,* 954 F.Supp. at 888 (emphasis added).

### 1. *Deliberate Ignorance*

Deliberate ignorance is "a subjective state of mind that is deemed to satisfy [the] scienter requirement of knowledge." *United States v. One 1973 Rolls Royce V.I.N. SRH-16266,* 43 F.3d 794, 808 (3d Cir.1994) ("Rolls Royce") (adopting deliberate ignorance rule in the context of civil forfeiture). Deliberate ignorance is a "state of mind of much greater culpability than simple negligence or recklessness . . . ." *Id.* (citing with approval *United States v. Rivera,* 944 F.2d 1563, 1570 (11th Cir.1991); *United States v. Rothrock,* 806 F.2d 318, 323 (1st Cir.1986)).

The deliberate ignorance instruction is found in *United States v. Jewell,* 532 F.2d 697 (5th Cir.), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). In *Jewell,* the defendant had been convicted of knowingly possessing illegal narcotics. 532 F.2d at 698. On appeal, the defendant argued the trial court committed reversible error when it instructed the jury he could be convicted, upon proof beyond a reasonable doubt, even though it determined he lacked positive knowledge a controlled substance was concealed in the automobile he was driving, if his lack of positive knowledge "was solely and entirely because of the conscious

purpose on his part to avoid learning the truth." *Id.* at 698.

The Fifth Circuit held that where "knowledge" of a particular fact is an element of an offense, proof a defendant was subjectively aware of a high probability of the existence of the fact in question is sufficient. The court explained the basis for the deliberate ignorance rule:

> The substantive justification for the rule is that deliberate ignorance and positive knowledge are equally culpable. The textual justification is that in common understanding one "knows" facts of which he [or she] is less than absolutely certain. To act "knowingly," therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, "positive" knowledge is not required.

*Jewell,* 532 F.2d at 700; *see also United States v. Hayden,* 64 F.3d 126, 133 (3d Cir. 1995) ("[D]efendants may not avoid the knowledge requirement of criminal statutes merely by ignoring the high probability they may be breaking the law.").

A deliberate ignorance instruction must make clear the defendant himself or herself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable person would have been aware of the probability. *Rolls Royce,* 43 F.3d at 808 n. 12 (quoting *United States v. Valle-Valdez,* 554 F.2d 911, 914 (9th Cir.1977)).

The leading Circuit decision regarding the deliberate ignorance rule is *United States v. Caminos,* 770 F.2d 361, 365 (3d Cir.1985). In *Caminos,* the defendant was convicted of knowingly importing cocaine into the country and possession of cocaine with intent to distribute. *Id.* at 362. The Circuit approved the deliberate ignorance instruction given by the trial court, which read, in pertinent part:

> In that connection, the element of knowledge may be satisfied by inferences from the proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him. When knowledge of the existence of a particular fact is an element of the offense, such knowledge

is established *if a person is aware of a high probability of its existence and than fails to take action to determine whether it is true or not.* If the evidence shows you that he actually believed that no cocaine existed, he cannot be convicted.. Nor can he be convicted for being stupid or negligent or mistaken. More is required than that.... [i]t is the jury's function to determine whether or not there was a deliberate closing of the defendant's eyes to the inferences, the conclusions to be drawn from the evidence here....

*Caminos,* 770 F.2d at 366 (emphasis added).

The instructions on deliberate ignorance in the instant case are substantially similar to the instruction approved in *Caminos.* With regard to the charges of mail fraud, the following instruction was given:

The Government can ... meet its burden of showing that a defendant had actual knowledge of the fraud if it establishes beyond a reasonable doubt that a particular defendant acted with deliberate disregard of whether the statements were true or false or with a conscious purpose of avoiding learning the truth.

If the Government establishes beyond a reasonable doubt that a particular defendant acted with deliberate disregard for the truth, than the knowledge requirement would be satisfied unless the defendant actually believed the statements to be true. This guilty knowledge, however, cannot be established by demonstrating that a defendant was merely negligent or foolish.

Trial Tr. at 2971. With regard to the tax evasion charges, the following instruction was given with regard to deliberate ignorance of the law:

The defendants' knowledge of his or her legal duty to pay income taxes on taxable income may be proved by inferences drawn from evidence that the defendant closed his or her eyes to what would otherwise have been obvious to him or her. Namely that he or she had a duty to pay income taxes on taxable income.

A finding beyond a reasonable doubt of a conscious purpose by the defendant to avoid enlightenment of the law would permit an inference of knowledge. Stated another way, a defendant's knowledge of the fact may be inferred from his or her willful blindness to the existence of a fact.

It is up to you as to whether you find any deliberate closing of the eyes by a defendant you are considering with regard to the requirements for the Internal Revenue laws and inferences to be drawn from such evidence. If you find the defendant's conduct was due to negligence or a good faith mistake of law, that is not sufficient to support a finding of willfulness.

Tr. at 3014–15.

The jury was instructed that to find Barbara Bissell guilty of violating Section 7206(1) it "not only must find that [she] did the acts of which she ... stands charged, but [it] must also find the acts were done knowingly...." Tr. at 3027. The jury was instructed:

When knowledge of the existence of a particular fact is an element of the offense, such knowledge is established if you find beyond a reasonable doubt that the defendant was aware of a high probability of its existence and then failed to take action to determine whether or not it was true. It is entirely up to you as to whether you find any deliberate closing of the eyes by a defendant and the inferences to be drawn from such evidence.

A showing of simple negligence or mistake, however, is not sufficient to support a finding of willfulness or knowledge. More is required.

You may find the defendant you are considering acted knowingly and willfully if you find either that he or she knew about the tax liability for the prosecution years or that he or she deliberately closed his or her eyes to what he or she had every reason to believe was the fact.

On the other hand, if you find the defendant was honestly mistaken or merely ignorant about his or her obligation to report certain types of income and to claim certain types of deductions, then you may not find that defendant guilty.

Trial Tr. at 3028–29.

As indicated, the jury was cautioned that Barbara Bissell could not be convicted if it

was determined she actually believed the statements, contained in the mailings in furtherance of the mail fraud or in the filings in furtherance of the tax evasion accounts, were true. The Deliberate Ignorance Instructions further provided that a determination that Barbara Bissell was merely negligent or foolish was insufficient to convict. Accordingly, the Deliberate Ignorance Instructions were appropriate.

### 2. *Instruction on Deliberate Ignorance*

A deliberate ignorance instruction is appropriately given when a defendant asserts a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance. *United States v. Neville*, 82 F.3d 750, 760 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 249, 136 L.Ed.2d 177 (1996). Moreover, where the evidence presented supports both actual knowledge on the part of the defendant and deliberate ignorance, a deliberate ignorance charge is proper. *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir.) (citing *United States v. Gruenberg*, 989 F.2d 971, 974 (8th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1868, 134 L.Ed.2d 965 (1996); *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir.), *cert. denied*, 508 U.S. 979, 113 S.Ct. 2979, 125 L.Ed.2d 676 (1993)).

 Barbara Bissell suggests "the use of [deliberate ignorance instructions] seems to be confined to contraband cases and drug forfeiture cases which are commonly carried out under clearly suspicious circumstances." Moving Brief at 12 (citing *Jewell*, 532 F.2d 697). This suggestion is unsupportable. *See e.g. United States v. Anderskow*, 88 F.3d 245, 251–52 (3d Cir.1996) (evidence of defendant's willful blindness was sufficient to support element of guilty knowledge necessary to sustain convictions for conspiracy, wire fraud and money laundering). Deliberate ignorance instructions are properly given in both mail fraud and tax evasion cases. *See e.g., United States v. Whittington*, 26 F.3d 456, 462 (4th Cir.1994) (mail fraud); *United States v. Wisenbaker*, 14 F.3d 1022, 1027–28 (5th Cir.1994) (tax evasion); *United States v. Lennartz*, 948 F.2d 363, 368–69 (7th Cir.1991) (mail fraud); *United States v. Schnabel*, 939

F.2d 197, 204 (4th Cir.1991) (mail fraud); *United States v. Stout*, Crim. No. 89–317–1–2–3, 1990 WL 136341, at *26 (E.D.Pa., Sept. 18, 1990) (mail fraud), *aff'd*, 932 F.2d 961 (3rd Cir.) (table), *cert. denied*, 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 161 (1991).

A deliberate ignorance instruction should not be given if there is no evidence the defendant had any knowledge of the facts in question. *United States v. Baron*, 94 F.3d 1312, 1317 (9th Cir.1996) (charge improperly given where no evidence that defendant was aware of secret compartments in car or that he suspected that his acquaintance was involved in drug trafficking) (citing *United States v. Sanchez–Robles*, 927 F.2d 1070, 1074 (9th Cir.1991)).

Instructing the jury on deliberate ignorance was appropriate in the instant case. Barbara Bissell's defense was that she lacked knowledge of the criminal activity of Nicholas Bissell and Defendants' accountant Thomas Wagner. Moving Brief at 11. As indicated, prior to sentencing, Barbara Bissell argued her sentence should be adjusted downward because she had accepted responsibility for her "deliberate ignorance" of facts. Barbara Bissell's argument that the evidence at trial did not support an instruction on deliberate ignorance is specious. As is discussed below, the evidence at trial overwhelmingly supported an instruction on deliberate ignorance.

### 3. *The Evidence of Deliberate Ignorance*

Barbara Bissell argues the evidence demonstrated she "lacked the knowledge that her attorney husband and ... accountant had conspired in a fraudulent skimming/tax evasion scheme...." Moving Brief at 11. She further argues "[t]here were no suspicious circumstances where [she] should have questioned an attorney and an accountant regarding the propriety of the actions they took. There were no signals that would have created an awareness that they were engaged in unlawful conduct." Moving Brief at 12. This argument is frivolous; at trial, there was overwhelming evidence to justify instructing the jury on deliberate ignorance.

Barbara Bissell did not testify at trial. In the Moving Brief, she relies upon her denial of knowledge of wrongdoing during a videotaped interview (the "Interview") with Federal investigators, held on 21 April 1995, which was played to the jury.[5]

Barbara Bissell argues that during the Interview "she stated that she just signed everything at her husband's request without reading it. She believed that there was no reason not to. He was her lawyer and both he and Tom Wagner, the accountant, had superior knowledge and understanding than she had in business matters." Moving Brief at 8. Barbara Bissell also *argues* she "contended that she signed all of the checks and documents that the government produced and handled the payroll and any other matters under the supervision and subject to the instructions of her attorney husband and their accountant." *Id.* at 7.

Barbara Bissell's argument "she did not suspect that anything illegal was occurring because she did not suspect that her attorney and accountant were engaged in anything unlawful," Moving Brief at 8, is without merit. The evidence at trial established Barbara Bissell was a "full partner with her husband and assisted him in the criminal conduct." *Bissell*, 954 F.Supp. at 895.

During the Interview, Barbara Bissell made a number of false and misleading statements to the Federal investigators. For example, Barbara Bissell falsely denied paying for personal expenses from the Bedminster Station:

CARBONE: Have you ever taken any money out of the bag?

[BARBARA] BISSELL: No sir I haven't.

CARBONE: Have you or your husband ever taken any money out of weekend receipts?

[BARBARA] BISSELL: No sir we haven't. Um, it's, doesn't do very well, the way uh, really the only way that we ever benefit from the station is it pays the gas station, pays gas bills, I don't know like my gas, uh Amoco bill, it'll, and also we put it uh American Express and stuff like that, but we never take cash out of it.

CARBONE: I'm sorry what do you mean put in American Express?

[BARBARA] BISSELL: There is a look, for instance uh there's a bill, American Express bill or whatever might be paid, you know or something like that.

CARBONE: For personal expenses?

[BARBARA] BISSELL: Uh for really, for, if it's just, if we need something for the gas station we do everything through the American Express.

CARBONE: Okay, are there any personal items?

[BARBARA] BISSELL: Uh.

CARBONE: Paid for, bought with that card.

[BARBARA] BISSELL: Uh per-, personal items as in um, perhaps by, maybe uh, you know meal or something like that.

CARBONE: When I say personal I mean having nothing to do with the gas station.

[BARBARA] BISSELL: I know, we try not to do that no. But we do have um, it pays, as I said the gas bills, you know gas, we really don't have to buy any gas or anything 'cause we have gas station.

CARBONE: Does it pay for anything else?

[BARBARA] BISSELL: No it's uh, it doesn't really pay for itself to tell you the truth.

CARBONE: So there are absolutely no other personal expenses paid by the gas station?

5. At argument on 27 January 1997, counsel for Barbara Bissell argued Barbara Bissell was "coerced into coming to the U.S. Attorney's Office." 27 January 1997 Tr. at 16. There is no evidence in the record that Barbara Bissell was coerced into going to the Office of the United States Attorney, on 21 April 1996, or that she was coerced into allowing herself to be interviewed. On the contrary, the Assistant United States Attorney who conducted the interview strongly advised Barbara Bissell that she did not have to be interviewed. During the Interview, Barbara Bissell acknowledged that she and Nicholas Bissell initiated the meeting. Interview Tr. at 2. Barbara Bissell was informed she was a "potential defendant" and a "target of the grand jury's investigation." *Id.* She was advised she had the right to have an attorney present. *Id.* Barbara Bissell rejected the advise and consented to the interview.

[BARBARA] BISSELL: Uh, they, I think it has the automobile insurance, that's how it benefits us, it pays that bill too.

CARBONE: Well does it pay for the car?

[BARBARA] BISSELL: Uh pay for the car, no.

CARBONE: It doesn't?

[BARBARA] BISSELL: No.

CARBONE: Who pays those bills?

[BARBARA] BISSELL: Uh he has a lease car and I have a car, he pays for that.

CARBONE: So you don't write any checks for your car for instance?

[BARBARA] BISSELL: No. Not for my car. Not a car payment, no.

CARBONE: You don't write any checks?

[BARBARA] BISSELL: Now what I do is, my car is paid through the bank I believe we pay of that out our personal account. He has a leased car and I have a car.

Interview Tr. at 16–18.

Documentary evidence introduced at trial proved Barbara Bissell charged the majority of more than 250 personal charges paid for by the Bedminster Station. Barbara Bissell wrote the majority of the checks to American Express; the evidence, moreover, proved the Bedminster Station paid for her car.

The evidence introduced at trial demonstrated, moreover, Barbara Bissell engaged in skimming from the Bedminster Station. On 4 March 1994, Barbara Bissell appeared alone at the Bedminster Station to collect the station's cash receipts. On that date, the evidence proved *she* skimmed $500 from the station. Prior to sentencing, Barbara Bissell argued she took the $500 from the Bedminster Station at her husband's request and put it away in her "hope chest." Presentence Investigation Report, ¶ 112.

In the Moving Brief, Barbara Bissell argues she simply signed, without question, any document Nicholas Bissell put in front of her. Moving Brief at 13. Barbara Bissell argues she did not read the many fraudulent

tax related documents she signed and, even if she had, she would have been unable to recognize any errors. She argues, therefore, the Deliberate Ignorance Instructions were inappropriate. *Id.* at 14. This argument is not supported by the evidence.

At trial it was proved that Barbara Bissell signed a subchapter S Corporation tax form which falsely declared her to be one hundred percent owner of the Bedminster Station. Trial Tr. at 1632. During the Interview, moreover, Barbara Bissell was shown the Bedminster Station's 1992 tax return which appeared to bear Buddy Thornburg's signature. She denied knowing anything about the return. Interview Tr. at 8. The tax return falsely declared a $34,000 tax loss. At trial, it was established that Barbara Bissell had forged Buddy Thornburg's signature to the tax return. Trial Tr. at 1633.

Defendants' lavish lifestyle on a limited income also undermines Barbara Bissell's argument against the Deliberate Ignorance Instructions. At trial, an Internal Revenue Agent (the "Agent") testified about of Defendants' sources of income. The Agent took into account Defendants' legitimate income and estimated Defendants' and their two teenage daughters would have had nine dollars per week of available cash to live on in 1994.[6] Trial Tr. at 2052. The Agent further testified that her investigation had revealed that on three separate occasions unexplained cash deposits of $1000 had been made into Barbara Bissell's account and that Barbara Bissell immediately afterward had written checks to MasterCard or Visa. *Id.* at 2054.

In summary, to accept Barbara Bissell's argument there was no evidence that supported giving the Deliberate Ignorance Instructions would require a disregard of Barbara Bissell's theft of the $500 from the Bedminster Station, her forgery of Buddy Thornburg's signature on tax documents, her routine charging of personal expenses on the Bedminster Station's account, her lavish lifestyle on a limited income and her lying to

---

**6.** The Agent testified, based upon her calculations, Defendants' family had $100 per week cash available in 1991 $20 per week available in 1992 and $25 per week available in 1993. Trial Tr. at 2052.

Federal investigators.[7] Accordingly, Barbara Bissell's argument with regard to the instructions on deliberate ignorance does not raise a substantial question of law or fact supporting a continuation of bail pending appeal.

#### 4. *Barbara Bissell's Objections*

Prior to trial, the Government submitted proposed jury instructions (the "Proposed Jury Instructions"). Defendants were then given the opportunity to object to the Proposed Jury Instructions. Counsel for Barbara Bissell offered no objection to the deliberate ignorance language contained in the mail fraud instructions.[8] The Proposed Jury Instructions as they relate to tax evasion is set forth below. Barbara Bissell's objections to the instructions relating to the tax evasion charges are indicated; the language she argued should have been added to the instruction is set forth in brackets and underlined; the language she argued should not have been included is set forth in bold.

#### *Request No. 79* [9]

*TAX EVASION—WILLFULNESS—DE-LIBERATE IGNORANCE OF THE LAW*

The defendant's knowledge of his or her legal duty to pay income taxes on taxable income may be proved by inferences drawn from evidence that the defendant closed his or her eyes to what would otherwise have been obvious to him or her; namely, that he or she had a duty to pay income taxes on taxable income. A finding beyond a reasonable doubt of a conscious

---

**7.** Barbara Bissell's argument she was unwittingly included in Nicholas Bissell's criminal activity is undermined by trial testimony that, e.g., she had on more than one occasion expressed her dissatisfaction with her husband's salary as Prosecutor of Somerset County to Defendants' accountant, Trial Tr. at 1347, and the evidence of her personal expenses, paid for by the Bedminster Station.

**8.** The Proposed Jury Instructions relating to the mail fraud count provided:

> The Government . . . can meet its burden of showing that a defendant had actual knowledge of the fraud if it establishes beyond a reasonable doubt that a particular defendant acted with deliberate disregard of whether the

purpose by the defendant to avoid enlightenment of the law would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from his or her willful blindness to the existence of that fact. [You must, however, examine this concept very carefully. A person's deliberate avoidance of enlightenment such as to learn how to program his or her VCR, after many failed attempts, might not give rise to the inference that that person has the knowledge to program his or her VCR.]

Proposed Jury Instructions at 115.

#### *Request No. 100* [10]

*WILLFUL BLINDNESS AND CONSCIOUS AVOIDANCE OF KNOWLEDGE*

The element of knowledge and willfulness may be satisfied by inference drawn from proof that the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, the defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. [Willful Blindness may not be found, however, where there is merely an innocent avoidance of processes or information one is incapable of mastering or comprehending.]

**When knowledge of the existence of a particular fact is an element of the**

statements were true or false, or with a conscious purpose to avoid learning the truth. If the defendant acted with deliberate disregard for the truth, then the knowledge requirement would be satisfied unless the defendant actually believed the statements to be true. This guilty knowledge, however, cannot be established by demonstrating that the defendant was merely negligent or foolish.

Proposed Jury Instructions at 28–29. Barbara Bissell offered no objection to this proposed instruction. Trial Tr. at 2602.

**9.** Request No. 79 appears as Request No. 78 in the Government's Requests to Charge.

**10.** Request No. 100 appears as Request No. 99 in the Requests to Charge of the United States.

offense, such knowledge is established if you find beyond a reasonable doubt that the defendant was aware of a high probability of its existence and then failed to take action to determine whether it was true or not. It is entirely up to you as to whether you find any deliberate closing of the eyes by the defendant, and the inferences to be drawn from such evidence. A showing of simple negligence, [disinterest,] or mistake, however, is not sufficient to support a finding of willfulness or knowledge. More is required.

You may find that the defendant you are considering acted knowingly and willfully if you find either that he [or she] actually knew about his [or her] income tax liability for the prosecution years, or that he deliberately closed his [or her] eyes to what he had every reason to believe was the fact. On the other hand, if you find that the defendant was honestly mistaken or merely ignorant about his obligation to report certain types of income and to claim certain types of deductions, then you may not find him [or her] guilty.

Proposed Jury Instructions at 143.

Significantly, Barbara Bissell did not object to the giving of Proposed Jury Instruction No. 79. As indicated, she merely sought to incorporate a sentence containing a confusing analogy to the operation of a VCR.

The closest counsel for Barbara Bissell came to offering an objection to the giving of Proposed Jury Instruction No. 100 was a passing comment during a court conference, held on 28 May 1996 (the "28 May 1996 Court Conference"), to discuss the Proposed Jury Instructions. During the 28 May 1996 Court Conference, the following discussion, regarding Barbara Bissell's objections to Request No. 100 took place:

THE COURT: ... One hundred, bottom of the first full paragraph, [Ms.] Donnelly wants to add language.

\*　　\*　　\*　　\*　　\*　　\*

The last sentence ..., first paragraph, [Ms. Donnelly adds:] "Willful blindness may not be found. However, where there is merely an innocent avoidance of process or information one is incapable of mastering or comprehending."

MS. DONNELLY: Your Honor, it seems to me that the whole willful blindness concept comes from the couriers who take a suitcase of drugs and so forth. That is where the charge was aimed at.

*I personally don't believe the charge belongs in the case at all, but if it's going to be in the case*, it should be clarified that we're not dealing with a situation where someone is trafficking in drugs and deliberately doesn't ask what is in it.

THE COURT: Do you have any case law to support this proposed sentence?

MS. DONNELLY: No, but it just seems common sense.

THE COURT: I'm not going to give it.

You object to the next sentence. The first sentence of the following paragraph begins with the words "When the knowledge of the existence of a particular fact" and ends with the words "determine whether it was true or not." That seems to be a correct statement of the law, is it not?

MS. DONNELLY: I don't believe it is.

THE COURT: Why? Do you have any case law to say it's not?

MS. DONNELLY: No. I don't believe—I haven't seen it where it says that you have to take further action.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: I'm going to give it.

The last sentence of that language, that paragraph, rather, adds the word "disinterest" ... do you have anything to support the inclusion of that?

MS. DONNELLY: I'm sure that it just comports with simple negligence, disinterest or mistake. I mean, it comports with the other qualifications.

THE COURT: Disinterest, I don't read as being synonymous with negligence or mistake....

MS. DONNELLY: I'm not saying synonymous. I'm saying it comports with the concept.

THE COURT: I'm not going to give it.

Trial Tr. at 2642–44.

Counsel for Barbara Bissell's passing comment regarding her belief Proposed Jury Instruction No. 100 should not be given does not meet her requirement to state "distinctly the matter objected to and the grounds of the objection." Fed.R.Crim.P. 30 [11]; see *United States v. Rosero*, 42 F.3d 166, 173 (3d Cir.1994) ("Without a clearly articulated objection, a trial judge is not appraised sufficiently of the contested issue and the need to cure a potential issue....") (citing *United States v. Castro*, 776 F.2d 1118, 1128–29 (3d Cir.1985), *cert. denied*, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986)); see *United States v. Graham*, 758 F.2d 879, 883 (3d Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985). After the jury instructions were completed, moreover, counsel were invited to offer any objections to the instructions. Counsel for Barbara Bissell did not offer any objections. Trial Tr. at 3039.

### C. *Refusal of Appointment*

■ Barbara Bissell argues her defense was "prejudiced" because of the court's refusal to appoint her chosen attorney, Rita E. Donnelly, Esq. ("Donnelly"), under the Criminal Justice Act. Significantly, Barbara Bissell never submitted an *in forma pauperis* application to establish her inability to either retain counselor or obtain services under the CJA.

Barbara Bissell argues Donnelly "was required to represent [her] for more than a year with no compensation. More important is the uneven playing field created by the inability of Barbara Bissell to procure investigative services, expert analysis of tax documents, construction of charts and diagrams and daily transcripts that were provided to the [G]overnment." Moving Brief at 14. Donnelly feigns surprise that the Government had received daily transcripts of the trial. *Id.* at 14–15 ("Counsel was unaware that the [G]overnment had daily transcripts until co-counsel noticed a stack of transcripts at the end of the trial in the Prosecutor's Office").[12] Barbara Bissell's conclusory argument she was "prejudiced" by the refusal of the court to appoint her chosen counsel is not supported by fact. For the reasons set forth below it is without merit and appears fabricated.

The CJA requires that each United States district court ensure adequate representation of indigent defendants:

(a) Choice of plan.—Each United States district court, with the approval of the judicial council of the circuit, shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation in accordance with this section. Representation under each plan shall include counsel and *investigative, expert, and other services necessary for adequate*

---

**11.** Rule 30 provides:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.... The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.... No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection....
>
> *Id.*

**12.** On 28 January 1997, Joanne M. Caruso ("Caruso"), the court's reporter submitted a certification (the "Caruso Cert.") which responds to the arguments raised by counsel during argument on 27 January 1997. Caruso relates that on the day

of the arraignment, she approached both counsel for Nicholas Bissell and Barbara Bissell "regarding the purchase of daily copy transcripts when the trial began." Caruso Cert., ¶ 1. Caruso informed counsel of the possibility of splitting the costs of the transcripts with the Government but was subsequently informed that daily transcripts were not desired. *Id.,* ¶¶ 2–4. Caruso further states:

> The Government requested daily copy the day of [trial] and I provided same. The subject of the defense getting transcripts never came up again. At one point, [counsel for Barbara Bissell], at sidebar, asked to be converted to CJA and the request was denied. She asked me to provide a copy of said sidebar so that she could go to the Circuit. I provided the transcript free of charge and that was the *only* request for a transcript [counsel for Barbara Bissell] made.

Caruso Cert., ¶ 5 (emphasis in original).

*representation.* Each plan shall provide the following:

(1) Representation shall be provided for any financially eligible person who—(A) is charged with a felony . . . ;

.(3) Private attorneys shall be appointed in a substantial proportion of the cases. . . .

(b) Appointment of counsel.—Counsel furnishing representation under the plan shall be selected from a panel of attorneys designated or approved by the court, or from a bar association, legal aid agency, or defender organization furnishing representation pursuant to the plan. . . .

18 U.S.C. § 3006A (emphasis added).

Pursuant to the above-quoted provisions of the CJA, the judges of this court have adopted a plan (the "CJA Plan") to ensure the adequate representation of any person financially unable to obtain adequate representation. The CJA Plan is set forth in Appendix I of the General Rules for the District of New Jersey ("Appendix I").

The CJA Plan provides that attorneys for indigent defendants will be selected from a master panel of competent attorneys established and approved by the court (the "Master Panel"). Appendix I, ¶ (b)(3). Attorneys are selected, to the extent feasible, from the Master Panel on a rotational basis. *Id.,* ¶ (B)(6).[13] Significantly, the CJA Plan provides: "No party who is unable to obtain his [or her] own counsel shall select counsel from the [Master Panel], or otherwise. The selection of counsel *shall be within the exclusive province of the court.* . . ." Appendix I, ¶ (D)(2)(h) (emphasis added). The CJA Plan gives the court the discretion to appoint counsel for a party who is financially unable to pay retained counsel. *Id.* ¶ (D)(2)(m). The CJA Plan does not call for the appointment of the retained counsel under these circumstances. *Id.*

At argument, on 27 January 1997, counsel for Barbara Bissell conceded she had never submitted an affidavit of indigency on behalf of her client:

THE COURT: You never submitted an affidavit of indigency from your client before trial, during trial or before sentencing, did you?

[COUNSEL FOR BARBARA BISSELL]: No.

\* \* \* \* \* \*

THE COURT: Did you ever submit an affidavit of indigency from Mrs. Bissell before trial?

[COUNSEL FOR BARBARA BISSELL]: *She wasn't indigent then.*

THE COURT: During trial?

[COUNSEL FOR BARBARA BISSELL]: No.

THE COURT: Before sentencing?

[COUNSEL FOR BARBARA BISSELL]: No. . . .

27 January 1997 Tr. at 9. The fact that Barbara Bissell never established she was indigent prior to sentencing is dispositive. The fact that counsel concedes Barbara Bissell was not indigent prior to trial is inconsistent with her argument that Barbara Bissell was indigent as of the 9 February 1996 Conference. Moving Brief at 14; 9 February 1996 Tr. at 13–19.

### A. *Services Other than Counsel*

▮ As indicated, Barbara Bissell argues she has been prejudiced because of her inability to "procure investigative services, expert analysis of tax documents, construction of charts and diagrams and daily transcripts that were provided to the [G]overnment." Moving Brief at 14. For the reasons set forth below, this argument is without merit; the implication that such services were requested is improper.

The CJA provides that an indigent defendant may obtain services, other than counsel, necessary for their representation through an *ex parte* application to the court. 18 U.S.C. § 3006A(e)(1). Section 3006(e) of Title 18 provides:

(1) *Upon request.*—Counsel for a person who is financially unable to obtain *investi-*

---

**13.** It is, however, "the practice of the court in making . . . appointments to take into consideration the nature and complexity of the case, the experience of counsel, the residence or place of incarceration of the party, the convenience of witnesses, and all other relevant factors." Appendix I, ¶ (6).

gative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1).

In order to obtain Government appointed services under the CJA, therefore, a defendant must first establish that he or she is "financially unable" to obtain the services without Government appointment and that the services are "necessary" for an adequate defense. 18 U.S.C. § 3006A(e)(1); *United States v. Kennedy,* 64 F.3d 1465, 1470 (10th Cir.1995) (citing *United States v. Greschner,* 802 F.2d 373, 376 (10th Cir.1986), cert. denied, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). To establish financial need, a defendant must establish under oath or affirmation the circumstances from which a court can make a finding of indigency. Barbara Bissell did not do so and did not even attempt to do so. She never submitted an *in forma pauperis* application; she never sought to establish through testimony her now asserted indigency.

Services are "necessary for an adequate defense" when "a reasonable attorney would engage such services for a client having the independent financial means to pay for them." *See United States v. Goodwin,* 770 F.2d 631, 635 (7th Cir.1985) (quoting *United States v. Alden,* 767 F.2d 314, 318 (7th Cir. 1984)), cert. denied, 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986). Barbara Bissell never requested such services; she never sought to establish a need for such services.

Significantly, the CJA Plan does not require counsel to be appointed before a party may make an *ex parte* application for ap-

pointment of services. Appendix I, ¶¶ G(1)–(3), O. Section 3006 likewise contains no such requirement. Compare 18 U.S.C. § 3000A(e)(1) ("Upon request—*Counsel* ... may request [services]....") (emphasis added) with 18 U.S.C. § 3000A(e)(2) ("Without prior request.—(A) *Counsel appointed under this section* may obtain [services]....") (emphasis added) [14]; *see also United States v. Enigwe,* Crim. No. 92–257, 1994 WL 263261, at *2 (E.D.Pa. 13 June 1994) (appointment of expert, pursuant to Section 3006A(e)(1), is available to *pro se* defendants) (citing *United States v. Hamlet,* 456 F.2d 1284 (5th Cir. 1972), cert. denied, 414 U.S. 1026, 94 S.Ct. 452, 38 L.Ed.2d 317 (1973)); *United States v. Greschner,* 802 F.2d 373 (10th Cir.1986), cert. denied, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987); *Edwards v. United States,* 795 F.2d 958, 963 (11th Cir.1986), cert. denied, 481 U.S. 1019 (1987); *United States v. McHugh,* 1991 WL 293098, 1991 U.S. Dist LEXIS 19156 (N.D.Ill. 13 May 1991)).

The services available pursuant to Section 3000A(e)(1) include, if necessity is shown, daily transcripts, *see United States v. Bari,* 750 F.2d 1169, 1181–82 (2d Cir.1984) (district court erred in refusing defendants' request for daily transcripts of trial, pursuant to Section 3006A, where Government had ordered daily transcripts), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Scarpa,* 691 F.Supp. 635, 636 (E.D.N.Y.1988).

In her two paragraph conclusory argument, Barbara Bissell provides no basis for her assertion she was prejudiced by the court's refusal to appoint her chosen counsel under the CJA. Barbara Bissell never made an application for such appointment. Counsel for Barbara Bissell argued that she did not apply for appointment at the direction of her client. 27 January Tr. at 12. Accordingly, the failure to apply appears to have been a tactical decision on the part of Barbara Bissell and her counsel.

---

14. 18 U.S.C. § 3006A(e)(2) provides:
Without prior request.—(A) Counsel appointed under this section may obtain, subject to later review, investigative, expert, and other services without prior authorization if necessary for adequate representation. Except as provided in subparagraph (B) of this paragraph, the total cost of services obtained without prior authorization may not exceed $300 and expenses reasonably incurred.
*Id.*

Barbara Bissell also argues she was unable to obtain services necessary for her defense, including "investigative services, expert analysis of tax documents, construction of charts and diagrams and daily transcripts that were provided to the [G]overnment." Moving Brief at 14. Barbara Bissell never made an application for such services. Moreover, she does not specify the manner in which these services were necessary for an adequate defense.

Significantly, as mentioned, Barbara Bissell never requested the services she argues she was denied. Until now, counsel for Barbara Bissell never indicated Barbara Bissell was being denied these "necessary" services because of her financial circumstances. As explained, despite her implication otherwise, counsel for Barbara Bissell never requested that these services be provided. Counsel for Barbara Bissell conceded this during argument:

> THE COURT: Did you ever ask for funds for an investigator to be paid by CJA?
>
> [COUNSEL FOR BARBARA BISSELL]: Not separately. Only as a CJA appointment, that's all.
>
> THE COURT: Did you ever ask for funds from the CJA for payment of a transcript of any of these direct examinations or cross examinations?
>
> [COUNSEL FOR BARBARA BISSELL]: No.
>
> THE COURT: Did you ever ask for funds from the CJA for expert witnesses?
>
> [COUNSEL FOR BARBARA BISSELL]: No.

27 January 1997 Tr. at 10–11.

The record reveals counsel for Barbara Bissell merely *argued* that her *legal fees* should be paid for by the Government; however, she never established indigency to support such an application.

As indicated, Barbara Bissell retained her own counsel. The issue of her arrangements with counsel was raised at a court conference, held on 3 October 1995 (the "3 October 1995 Conf."). At that time, the court was prepared to appoint CJA counsel to represent Barbara Bissell if she was unable to make a satisfactory arrangement with her chosen counsel. It was emphasized to both counsel for Barbara Bissell and counsel for Nicholas Bissell that they were responsible for their financial arrangements with their clients:

> THE COURT: ... You're both making appearances on behalf of your respective clients which is fine with me. I want to advise you both that from this point forward each of you is in the case. Whatever your arrangements are with your clients is none of my business, I don't care, but you are in the case. You will remain in the case until it is over.

> \* \* \* \* \* \*

> MS. DONNELLY: Yes, your Honor.

3 October 1995 Conf. at 4–5.

At a court conference, held on 9 February 1996, despite the court's advice and counsel's agreement with the terms quoted above, counsel for Barbara Bissell, without establishing indigency, requested that she be appointed under the CJA. The transcript of the 9 February 1996 Conference reveals her request was motivated by concern over her legal fees, not prejudice to Barbara Bissell:

> MS. DONNELLY: ... [Barbara] Bissell has no money *and can pay no legal fees.* I understand that prior to this, you informed me that I was in regardless. At the time [Barbara] Bissell assured me that she could pay *legal fees* and that she had the money.
>
> Since then, the Government has taken the money she intended to pay for *legal fees* and she believes that she is qualified as indigent and asked me if she could make application for counsel under CJA.
>
> I know that you do not appoint counsel under CJA who have previously been in the case. I also know that *I'm a solo practitioner who cannot try a case for months without any income.*
>
> THE COURT: [Ms.] Donnelly, if I can interrupt you. We talked about this on October 3rd on pages four and five. I brought this out to you.
>
> MS. DONNELLY: I don't dispute that, your Honor.

THE COURT: I am not going to—*she can come in and swear indigency.* I'm not going to have the CJA *pay you.* If you want an order on that and if you think it is necessary to go to the Circuit I'll accommodate you, but [your request is denied] for two reasons.

Number one, you represented to me that you made your own deal with your client. I told you that I was scheduling based upon that. You assured me there was no problem.

And, number two, if this were the appropriate procedure, every defendant who wanted a CJA counsel would come up with whatever monies necessary to retain that chosen attorney and the attorney would come back and say, appoint me CJA and I don't believe that defendants have the right to chose a CJA attorney by name. That's my position on it.

MS. DONNELLY: I know that's your position, but I would like an order because I would like to have the Third Circuit review.

\* \* \* \* \* \*

THE COURT: ... [Y]ou are certainly right, as you suggest you want to do, to have Circuit review of this, but at this point if that's what the Circuit wants to do, I'm here saluting. Whatever their policy is, I'm certainly going to follow it. I will not be contentious about it, but at that point I think I've lost significant control of the ability to run my calendar and run my case load.

On the day in question, I had CJA attorneys standing by if you folks did not want to assume the responsibilities of defense counsel in this case.

I understand your position where you say you're a solo practitioner, but this is something I addressed to you way back in October. It's something that I addressed so I could plan....

Now, if I have to appoint a new CJA attorney, it will be difficult for him or her to be up to speed. The Government will have spent an extraordinary amount of money bringing in the [jury] pool and wasting it and all of this was the reason

that I discussed this with you ... on the record. It wasn't left to inference, it wasn't left to assumption. It was explicitly addressed head on.

MS. DONNELLY: True.

But there was a good faith belief that there would be funds available.

THE COURT: That may be, but that's the situation we have in every case.... If this is the policy of the Circuit, that means defendants who are entitled CJA attorneys can go out, hire whomever they please, give that person a retainer, have that person come back to me and say my client is no longer able to pay, I want to be hired CJA and that removes from the Court the ability to control the CJA list and, as I say, penalizes the other attorneys who have been on the CJA rotation and who have been taking cases which are far less than glamorous, taking cases which are—which have no publicity, taking cases which do not help that attorney at all. Some cases have more exposure than others and attorneys do want exposure because it helps them get other clients. I'm not addressing this to you....

You can ... submit an order to me.

9 February 1996 Conf. at 13–19. Counsel for Barbara Bissell did not submit an order.

Barbara Bissell's argument she was prejudiced because of the court's refusal to appoint her chosen counsel under the CJA is without basis in fact or law. The record reveals counsel for Barbara Bissell made the request for appointment, without establishing indigency as required, because of concern that she would not be paid. As well, counsel never argued Barbara Bissell was being denied necessary services because of her financial circumstances.

Barbara Bissell's argument is accordingly without merit and appears fabricated. As such it does not provide a substantial question that is "fairly debatable." *Handy,* 761 F.2d at 1281–82.

### D. *The Supplemental Reply*

An hour before oral argument, on 27 January 1997, a submission entitled "Letter Memorandum of Law Supplementing Reply Brief"

(the "Supplemental Reply") was received from the law firm of Bennett & Leahey ("Bennett & Leahey"). Apparently, Bennett & Leahey intends to enter an appearance on Barbara Bissell's behalf before the Third Circuit. Supplemental Reply at 2 n. 1.

Bennett & Leahey's status in the case is questionable. At oral argument, Donnelly confirmed the Circuit had appointed her counsel for Barbara Bissell under the CJA. Peter B. Bennett, Esq. ("Bennett") of Bennett & Leahey indicated his law firm had been privately "engaged" by Barbara Bissell, but that it had not been "retained." · 27 January 1997 Tr. at 3. Bennett & Leahey also indicated that despite being privately "engaged," it intends to seek appointment under the CJA. Supplemental Reply at 2 n. 1; 27 January 1997 Tr. at 3.

Barbara Bissell's apparent attempts to obtain public funding for her privately "engaged" attorneys is problematic. Similar to the discussion regarding Barbara Bissell's 9 February 1996 request to have her privately retained attorney appointed under the CJA, her "engagement" of private attorneys to represent her on appeal with the intention that these privately engaged attorneys will substitute for her CJA appointed counsel appears contrary to the purposes of the CJA.

On 20 December 1996, Barbara Bissell's *in forma pauperis* application (the "IFP Application") was granted. The IFP Application was granted for the sole purpose of enabling Barbara Bissell to obtain copies of the trial transcripts for her appeal. The granting of the IFP Application was in no way an endorsement for the appointment of Barbara Bissell's then privately retained attorney, Rita Donnelly. As mentioned, appointment of a privately retained attorney is inconsistent to this court's CJA Plan. At argument, on 27 January 1997, counsel for Barbara Bissell indicated she had been appointed CJA counsel by the Circuit.

> [Counsel for Barbara Bissell]: Your Honor, Barbara Bissell was sentenced on December 6. I filed an appeal on December 12.

I contacted the Third Circuit and indicated to the Third Circuit that I wish to withdraw, that I did not want to represent Mrs. Bissell on appeal.

The Third Circuit instructed me that I had to represent her on appeal, but that I could engage assistance from other counsel as long as I signed the documents.

27 January 1997 Tr. at 5.

At the time of argument, Bennett & Leahey had not entered an appearance on behalf of Barbara Bissell and, as indicated, Bennett & Leahey were not appointed counsel under the CJA. Furthermore, the apparent plan of counsel for Barbara Bissell to subcontract her work to Bennett & Leahey appears questionable. Does CJA appointed counsel for Barbara Bissell intend to act as a conduit for CJA funds to Barbara Bissell's "engaged" counsel? The Supplemental Reply was considered and Bennett was heard as a courtesy. The consideration of Bennett's arguments does not in any way endorse what appears to be an attempt to manipulate the CJA appointment.

### 1. *Deliberate Ignorance*

In the Supplemental Reply, Bennett builds on Barbara Bissell's argument that the Deliberate Ignorance Instructions should not have been given. Bennett restricts his argument to the instructions relating to ignorance of the law. Supplemental Reply at 4. Bennett argues the instructions on deliberate ignorance "permitted the jury to find knowledge of a legal duty based upon (1) actual knowledge or (2) her refusal to accept which should have been obvious to her—*i.e.*, what a reasonable person would have understood." *Id.* In making this argument, Bennett selectively quotes the Government's proposed instructions and an instruction given to the jury. *Id.* at 5.

Bennett argues the Deliberate Ignorance Instructions were "directly contrary to the holding of the Supreme Court" in *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Supplemental Reply at 5.[15]

---

**15.** The argument the Deliberate Ignorance Instructions were contrary to the holding in *Cheek,* differs from Barbara Bissell's prior arguments the instructions were improper. Bennett's last

In *Cheek*, the petitioner was charged with willfully failing to file a federal income tax return and attempting to evade income taxes. 498 U.S. at 194, 111 S.Ct. at 606–07. His defense at trial was that "he sincerely believed that the tax laws were being unconstitutionally enforced" and that his actions were not illegal. *Id.* at 196, 111 S.Ct. at 607–08. The trial court advised the jury

> that to prove "willfulness" the Government must prove the voluntary and intentional violation of a known legal duty, a burden that could not be proved by showing mistake, ignorance, or negligence. The court further advised the jury that an objectively reasonable good-faith misunderstanding of the law would negate willfulness, but mere disagreement with the law would not.... [The court] instructed the jury that if it found [the petitioner] "honestly and reasonably believed that he was not required to pay income taxes or to file tax returns" ... a not guilty verdict should be returned.

*Cheek*, 498 U.S. at 197, 111 S.Ct. at 608. Later, in response to a jury request for clarification, the trial court provided the following supplemental instruction:

> [A] person's opinion that the tax laws violate his constitutional rights does not constitute a good faith misunderstanding of the law. Furthermore, a person's disagreement with the government's tax collection systems and policies does not constitute a good faith misunderstanding of the law.

*Cheek*, 498 U.S. at 197, 111 S.Ct. at 608. At the end of the first day of deliberation, in response to a second jury request for clarification, the court instructed the jury that " '[a]n honest but unreasonable belief is not a defense and does not negate willfulness' ... and that '[a]dvice or research resulting in the conclusion that wages of a privately employed person are not income or that the tax laws are unconstitutional is not objectively reasonable and cannot serve as the basis for a good faith misunderstanding of the law defense.' ... The court also instructed the jury that '[p]ersistent refusal to acknowledge

the law does not constitute a good faith misunderstanding of the law.' " *Id.* at 198, 111 S.Ct. at 608. The petitioner appealed his convictions, arguing the trial court "erred by instructing the jury that only an objectively reasonable misunderstanding of the law negates statutory willfulness requirement." *Id.* at 198, 111 S.Ct. at 608.

The Supreme Court reversed, holding that even an objectively unreasonable misunderstanding of the tax laws negates the willfulness requirement:

> [I]f the government proves actual knowledge of the pertinent legal duty, the prosecution, without more, has satisfied the knowledge component of the willfulness requirement. But carrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws. This is so because one cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe the duty does not exist. In the end, the issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable.

*Cheek*, 498 U.S. at 201–202, 111 S.Ct. at 610.

Bennett also cites *Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) for support. *Ratzlaf* involved a willfulness requirement in the anti-structuring provision of the currency transaction statute, 31 U.S.C. § 5324. *Id.* at 137, 114 S.Ct. at 657. The trial court instructed the jury the Government did not have to prove the petitioner knew the structuring he was engaged was unlawful and the Ninth Circuit affirmed. *Id.* at 138, 114 S.Ct. at 657–58. The Court reversed, holding that to give effect to the willful requirement of Section 5322(a), the Government must prove the defendant acted

---

minute submission of the Supplemental Reply ensured the Government would not be able to submit a response. The late submission, more-

over, has made a review of the new arguments and the preparation of the instant opinion difficult.

with knowledge the structuring was unlawful. *Id.* at 149, 114 S.Ct. at 663–64.

Significantly, neither *Cheek* nor *Ratzlaf* involved deliberate ignorance instructions. This important point, ignored by Bennett, was addressed by the Eighth Circuit in *United States v. Dykstra*, 991 F.2d 450 (8th Cir.), *cert. denied*, 510 U.S. 880, 114 S.Ct. 222, 126 L.Ed.2d 177 (1993).

In *Dykstra*, the defendant was convicted of willfully filing false tax documents in violation of 26 U.S.C. § 7206(1) ("Section 7206(1)"). 991 F.2d at 452. On appeal he argued "that the inclusion of 'deliberate ignorance,' or 'willful blindness,' language in [the jury instruction] with respect to the willfulness element of [Section] 7206(1) was improper" in light of *Cheek*.[16] *Id.* at 452.

The Eighth Circuit rejected defendant's argument:

> [Defendant's] argument has already been considered and rejected by this court in *United States v. Bussey*, 942 F.2d 1241, 1249 (8th Cir.1991), *cert. denied*, 504 U.S. 908, 112 S.Ct. 1936, 118 L.Ed.2d 542 (1992). The *Bussey* court found the defendant's reliance on *Cheek* to challenge a willful blindness instruction was "*seriously misplaced.*" as the court pointed out, "*Cheek* did not involve a willful blindness instruction and is therefore irrelevant to Bussey's willful blindness issue on appeal."

*Dykstra*, 991 F.2d at 452 (emphasis added).

As discussed, deliberate ignorance is a "subjective state of mind" that may satisfy the element of "willfulness." *Rolls Royce*, 43 F.3d at 808. Contrary to Bennett's argument, Supplemental Reply at 5, the Deliberate Ignorance Instructions did not set forth an objective standard. The Deliberate Ignorance Instructions did not permit the jury to apply a reasonable person standard to the issue of Barbara Bissell's willfulness. As mentioned, the jury was instructed that a finding of negligence or good faith mistake of law is not sufficient to support a finding of willfulness. Tr. at 3014–15. The jury further received a "good faith" instruction consistent with *Cheek*. Specifically, the jury was instructed:

> In this case, Barbara Bissell contends that she did not act with specific intent to commit the crimes with which she is charged because she acted in good faith. Good faith is a complete defense to charges of acting knowingly and willfully or with fraudulent intent because good faith is simply inconsistent with the specific intent to defraud.
>
> If Barbara Bissell believed in good faith she was acting properly, even if she was mistaken in that belief and even if others were injured by her conduct, there would be no crime.
>
> If a person in good faith believes that an income tax return as prepared by him or her truthfully reports the taxable income and allowable deductions of the taxpayer under the Internal Revenue laws, he or she cannot be guilty of willfully preparing, or presenting, or causing to be prepared or presented a false or fraudulent return.
>
> The defendant is under no obligation to prove his or her good faith. Rather, the Government must prove bad faith or knowledge of falsity beyond a reasonable doubt.
>
> If you find Barbara Bissell guilty of violating Section 7206(1) . . ., you not only must find that [she] did the acts of she . . . she stands charged, but you also must find that she acts were done knowingly and willfully by [her] . . . but you also must find the acts were done knowingly and willfully . . . with the specific intent to defraud the Government.

Trial Tr. at 3026–27.

### 2. *Additional Arguments*

■ Bennett made four new arguments on behalf of Barbara Bissell in the Supplemental Reply. As mentioned, the Supplemental Reply was submitted one hour before oral argument. This last minute submission prevented more than a cursory review of the new arguments and ensured the Government would not have the opportunity to respond or

---

16. The instruction as issue provided in relevant part: "[t]he element of willfulness is satisfied if the defendant deliberately closed his eyes to what would have otherwise been obvious to him." *Dykstra*, 991 F.2d at 452.

prepare for oral argument. Bennett indicates four general arguments that support bail pending appeal:

(1) The Court's *ex parte*, off-the record contacts with the jury during the trial;

(2) The court's indication to the jury of its view of the credibility of Nicholas Bissell during his testimony at trial;

(3) The court's treatment of Ms. Donnelly during the trial;

(4) The court's evidentiary rulings during the trial and marshaling of evidence for the [G]overnment.

Supplemental Reply at 8.

These arguments are without basis in fact. At argument, Bennett conceded he did not review the trial transcripts. 27 January Tr. at 17. In fact, Bennett conceded he had reviewed very little information before agreeing to appear in the case and filing the Supplemental Reply. *Id.* The raising of such serious allegations before conducting even a cursory investigation is inappropriate. A review of the record reveals no support for any of the arguments. In fact, a review of the record and comments of counsel reveals counsel adopted an informal approach with the jury as a trial tactic. As demonstrated below, counsel did not desire a formalistic or stiff or impersonal approach to or treatment of the jury when scheduling problems arose or during the trial itself. For example, invariably when minor scheduling problems did arise they concerned the health of counsel to Nicholas Bissell who did not want to have these problems highlighted before the jury. He wanted the jury apprised of the necessary changes in scheduling, but in an informal manner. Counsel to Barbara Bissell concurred with her co-counsel's request.

The argument regarding inappropriate communications with the jurors is particularly troubling. During the trial, after informing counsel and with counsel's approval, the court advised the jurors, without a court reporter, of minor scheduling changes. The late submission of the Supplemental Reply prevented an exhaustive review of the trial transcripts, however, it appears only a very few such communications took place. On 30 April 1996, the jury was told they were excused for the day (the "30 April 1996 Com-

munication"). Trial Tr. at 354. On 16 May 1996, the jury was informed that the trial would not go forward that day (the "16 May 1996 Communication"). *Id.* at 2156. The health problems of counsel for Nicholas Bissell precipitated the adjournment of the trial on that date. *Id.* On 28 May 1996, the jury was informed that a juror had been excused because of a death in her family (the "28 May 1996 Communication"). *Id.* at 2594. On 30 May 1996, the jurors were informed that court would conclude for the day at 4:00, *id.* at 3048, and that they could take a 15 minute break (the "30 May 1996 Communications"). *Id.* at 3054.

As indicated, counsel for Barbara Bissell offered no objections to these communications. At oral argument, the discussion prior to the 30 April 1996 Communication, which indicated counsel for Barbara Bissell offered no objection, was read into the record. Counsel for Barbara Bissell responded by arguing she had objected the first time the court inquired about a communication with the jurors:

[COUNSEL FOR BARBARA BISSELL]: Your honor, I must ask the [c]ourt ... [i]f it is not true that I asked when the [c]ourt said it was going into the jury room, the first time, isn't it on the record that I said is there a problem with bringing the jury out into the courtroom and having it done on the record in open court?

I had never, ever been requested to agree to have a judge go into the jury room. I recall putting that on the record at that time. *So I think it's unfair for the [c]ourt to read something toward the end of the case. . . .*

27 January 1997 Tr. at 29 (emphasis added).

A review of the record indicates the 30 April 1996 Communication was the first such communication with the jurors. The record reveals that the comment to the jury concerning scheduling was made with the informed consent of counsel.

On 30 April 1996, the illness of counsel for Nicholas Bissell necessitated that the trial day end early. Prior to the 30 April 1997 Communication, the following discussion took place:

THE COURT: I'm going to go in and tell the jury they're excused for the day. If they ask anything about you, I'll say you're not feeling well. If they don't, I wouldn't say anything.

Does anybody object to me talking with them in the jury room without parading them back out?

[COUNSEL FOR BARBARA BISSELL]: No.

[COUNSEL FOR NICHOLAS BISSELL]: No.

[COUNSEL FOR THE GOVERNMENT]: No.

Trial Tr. at 354.

On 28 May 1996, a juror was excused because of a death in her family. Trial Tr. at 2594. As mentioned, the 28 May 1996 Communication informed the jury of this development. Prior to the 28 May 1997 Communication, the following discussion took place:

THE COURT: ... Counsel, I'm sure you know, my secretary called you and let you know last week, that [a] juror ... had a death in the family.... She asked to be excused from further jury service, juror number 11. I acceded to her request.

All we're going to do is just leave the juror sitting in the same seats. We'll leave that one seat vacant.

If no one has an objection, after we do the charge conference, I'll go in and talk with the jury and let them know there is a death in the family and that's why she's not here.

Is there any problem with that?

[COUNSEL FOR NICHOLAS BISSELL]: No, sir.

[COUNSEL FOR THE GOVERNMENT]: None.

[COUNSEL FOR BARBARA BISSELL]: No.

Trial Tr. at 2594.

On 30 May 1996 the following discussion took place:

THE COURT: I indicated to you folks that I was going to tell the jury, and I should have done it earlier, that we will stay until 4:00 unless they tell me they want to deliberate beyond four, then we will stay at their convenience, but it will be their option whether to stay beyond four or until four if they don't complete the deliberations today.

When I mentioned that to you, each of you folks said you had no objection to me just going in the jury room and telling them that.

Mr. Rabner, is that correct?

[COUNSEL FOR THE GOVERNMENT]: That's correct.

THE COURT: [Ms.] Donnelly?

[COUNSEL FOR BARBARA BISSELL]: Correct.

[THE COURT]: Mr. Belsole?

[COUNSEL FOR NICHOLAS BISSELL]: Yes sir.

Trial Tr. at 3048–49. Later in the day, the court's deputy clerk reported the jury wanted to take a break in their deliberations. *Id.* The following discussion took place:

THE COURT: Counsel, before we get to this matter, my deputy clerk advises that the jury wants to have a break this afternoon as they've had during the course of the trial, so unless anybody objects, after this I'll go in and tell them they can take a 15 minute break. Some of them want to go downstairs, but I'll tell them they have to stop deliberating and come back.

Any problem?

[COUNSEL FOR THE GOVERNMENT]: None.

[COUNSEL FOR NICHOLAS BISSELL]: No.

[COUNSEL FOR BARBARA BISSELL]: No, your Honor.

Trial Tr. at 3054.

Only two requests by counsel for Barbara Bissell are arguably relevant. As is discussed below, however, contrary to her argument on 27 January 1997, no communications were made with the jury without the full, informed consent of counsel.

On 13 May 1996, counsel for Nicholas Bissell asked that the court schedule "four-day weeks" to accommodate medical difficulties he had been experiencing. Trial Tr. at 1656. Counsel for Barbara Bissell indicated she agreed with counsel for Nicholas Bissell but

asked *"if* the [c]ourt determines that it's going to elicit opinions from the jury about the scheduling, I would prefer that they be in court so I can see who's objecting and who is not objecting and see what their reaction is if you're going to make changes[.]" *Id.* at 1656–57 (emphasis added). Significantly, it was determined that the schedule would not be adjusted and, therefore, no communication with the jury regarding the schedule was made. *Id.* at 1659.

On 16 May 1996, counsel for Nicholas Bissell telephoned "from the road" on his way to court and indicated that he was ill. Trial Tr. at 2148. Counsel returned home and again telephoned chambers. *Id.* Counsel for Barbara Bissell and the Government were present. *Id.* The following discussion ensued regarding the scheduling problem raised by counsel for Nicholas Bissell's illness:

> THE COURT: As I said during the course of the trial, whatever I need to do to accommodate you [ (trial counsel) ], I'm going to do.
>
> I suggest what I'm going to have to do is send the jury home today. . . .
>
> [Counsel for Nicholas Bissell] mentioned to me in the earlier phone call maybe [he could] come in tomorrow and try the case. We should talk about that.
>
> As I indicated to you [Mr. Belsole], after our discussion Tuesday where you reiterated you wanted to have Friday off, I went and told the jury Wednesday morning that, indeed, they would have Friday off again this week. Several of the jurors need to know that for planning purposes.
>
> I'm certainly willing to go back and ask whether they can sit tomorrow, but before I do that, I need to know whether [counsel for Nicholas Bissell will] be available for tomorrow.
>
> [COUNSEL FOR NICHOLAS BISSELL]: I have no way of knowing. In other words, until I see the [doctor] at 1:30, he tells me what to do or not do, I don't know.
>
> THE COURT: Let me do this then: I have their phone numbers. Does anybody object to me speaking with the jury and asking if anybody has a problem coming in tomorrow, alerting them to the fact that

we will not know until later this afternoon as to whether we're going to need them?

> \*　　\*　　\*　　\*　　\*　　\*
>
> [COUNSEL FOR BARBARA BISSELL]: No.
>
> THE COURT: All the attorneys agree they have no problem with that. I'll speak with the jury later.
>
> Is it necessary I take the reporter in to tell the jury about this?
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [COUNSEL FOR BARBARA BISSELL]: Is there any problem with taking the reporter?
>
> THE COURT: I don't want to make the jury feel they're being cross-examined, *but if you want it on the record, I'll put it on the record.* It's up to you folks. . . .
>
> [COUNSEL FOR NICHOLAS BISSELL]: I don't understand.
>
> THE COURT: I don't want the jury to think when I ask them if they have a problem with the reporter present—if you're not comfortable with having me speak with them . . .
>
> [COUNSEL FOR NICHOLAS BISSELL]: I'm comfortable. What I meant to say, without a court reporter is fine with me.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [COUNSEL FOR BARBARA BISSELL]: I have a problem in wanting to assess what the jury's reaction is to all of this myself. I would like to be able to do that. If it's a problem, I will forego it.
>
> THE COURT: What do you want me to do?
>
> [COUNSEL FOR BARBARA BISSELL]: Is there a problem with just bringing the jury out and talking to them in the courtroom?
>
> The Bissells want to see the jury's reaction, too, being asked to change plans and so forth.
>
> **THE COURT: I'm not going to ask them unless you folks want me to. I'm only offering to do this. I'm not directing any of this. I'm trying to accommo-**

date everybody on this. If you don't want me to ask them, I won't ask them. I'll say they have today and tomorrow off, resuming Monday. *This is an open invitation as to what you folks want me to do.*

\*　　\*　　\*　　\*　　\*　　\*

[COUNSEL FOR BARBARA BISSELL]: I would prefer, since I don't know what their reactions are to all of this, these changes, I would prefer that it be in open court where the Bissells can see their reactions when the Judge speaks to them about changes.

I don't know, is that a problem with you?

[COUNSEL FOR NICHOLAS BISSELL]: With me?

[COUNSEL FOR BARBARA BISSELL]: Yeah.

[COUNSEL FOR NICHOLAS BISSELL]: *The problem is if they're coming into open court and I'm not there.*

[COUNSEL FOR BARBARA BISSELL]: Oh, okay.

[COUNSEL FOR NICHOLAS BISSELL]: At this point, if there is going to be any problems, it's going to be because of me. I mean, the jurors are going to see you people and whatnot. I haven't figured out—and frankly, I don't think it amounts to a wit as to what the jury is going to think or not think.

In other words, I'm not in a situation where I have been trying to keep coming in and doing this. I'm not going to come in there and sit there just to worry what the jury will think.

It seems to me if the Judge wants to say to the jury, just see what they want to do or what their convenience or inconvenience is, that's fine with me.

\*　　\*　　\*　　\*　　\*　　\*

[COUNSEL FOR BARBARA BISSELL]: *I'm satisfied with [counsel for Nicholas Bissell's] statements. I'm satisfied with whatever you want to do.*

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: I'm perfectly comfortable with approaching the jury. *I want guid-*ance from you folks as to whether you want me to do this informally, *as I've spoken to the juror's before, telling them they will have Fridays off, we've all agreed to that, whether you want me to do it in the jury room, but add the court reporter or whether you want me to bring them out in the courtroom, have them sit down and go through all of this with them.

**I'm willing to do whatever you want. All I want is guidance from you folks because, frankly, I don't want to hear at a later point I did something contrary to your wishes or I did something which adversely affected you, your client or your case . . . .**

All I'm doing is offering the alternative. If you elect to pursue the alternative, just give me a suggestion of the procedure you would like me to follow. . . . I want to know if you want me to do it . . . in the jury room on the record, in the jury room off the record or in the courtroom. And I'm going to insist that you select one of the alternatives. . . .

[Counsel for Nicholas Bissell]: *Go into the jury room* **informally** *and do what you think you ought to do in terms of calling the jury, asking them what they want to do.*

THE COURT: With or without a court reporter?

[Counsel for Nicholas Bissell]: Without a court reporter because I don't think to date we've used a court reporter and I have faith in your relationship with this jury. I don't need a court reporter.

\*　　\*　　\*　　\*　　\*　　\*

[COUNSEL FOR BARBARA BISSELL]: *I concur* with [counsel for Nicholas Bissell].

Trial Tr. at 2149–55 (emphasis added).

As indicated, the 16 May 1996 Communication with the jury was made as an courtesy to defense counsel. Counsel for Barbara Bissell was informed in advance of the communication and agreed with counsel for Nicholas Bissell's request that the communication be made without a court reporter present.

The only unreported communications with the jurors regarded minor scheduling questions and were made with the informed consent of counsel and because of their desire for informality. Accordingly, Bennett's argument regarding improper communications is without basis. It is troubling that Bennett made these allegations without even a rudimentary investigation. At argument, Bennett's lack of knowledge regarding the basis of his argument was apparent:

> THE COURT: ... Are you representing to me that I said something improper to the jury or that [Counsel for Barbara Bissell] told you I did?
>
> MR. BENNETT: I can't because I don't know what you said.
>
> THE COURT: So you're telling me that you submitted this eight-page letter suggesting there were ex parte, off-the-record contacts with the jury that you think may have been improper?
>
> MR. BENNETT: Your Honor, here's all I'm submitting, that based on what I've learned, you went in and talked to the jury on more than one occasion and that it was not on the record. That's what I'm submitting and we're going to explore whether or not ... that constitutes error....

27 January 1997 Tr. at 25–26.

Bennett's remaining arguments are conclusory and are so lacking in support as to make addressing them virtually impossible. For example he suggests the court expressed its view of Nicholas Bissell's credibility to the jury. This is simply baseless.[17] The record speaks for itself. Barbara Bissell received a fair and impartial trial. Counsel for Barbara Bissell was likewise treated fairly; counsel for Nicholas Bissell and the Government were treated in a similar fashion. Bennett's meritless arguments, submitted at the last minute, stretch the acceptable boundaries.

*3. Request for a Stay of Sentence*

■ In the Supplemental Reply, Bennett also asked for a stay of execution of Barbara Bissell's sentence so that she may attend a program entitled, Children's Attitude, Reaction and Emotions towards Suicide ("Cares") at the New York Hospital–Cornell Medical Center. Supplemental Reply at 2. At argument, Bennett further asked for a stay so he could have "a further opportunity to at least review the record before we present any issues or a motion panel on the Court of Appeals." 27 January 1997 Tr. at 36. As mentioned, Bennett did not perform even a brief review of the record before asserting these issues.

*1. The CARES Program*

CARES is a ten week program "for children ages 6 through 12 and young adolescents ages 13 through 15 who have lost a family member or friend to suicide." Supplemental Reply, Exhibit A. CARES "is part of a research study on the impact of suicide on children and adolescents." *Id.*

CARES is a "research program" and the commencement date of the next ten week program has not been set. 27 January 1997 Tr. at 41. The Bissells have not been accepted into the CARES program; Barbara Bissell intended to attend an initial screening interview on 28 January 1997. *Id.* at 37. Significantly, the Bissell children will be able to attend the CARES program with their guardian if Barbara Bissell is unavailable. Supplemental Reply, Exhibit A; 27 January 1997 Tr. at 39. Also significant is the lack of treatment provided to the Bissell children to date.

At argument, the Government indicated that it had offered the assistance of its "Victim/Witness coordinator ... to provide

---

**17.** The argument the court undermined the credibility of Nicholas Bissell's testimony by facial gestures is baseless. During the course of trial, particularly while Nicholas Bissell was testifying, there were no facial expressions. At argument, on 27 January 1997, Counsel for the Government characterized Bennett's argument as baseless. 27 January 1997 Tr. at 28. The court's reporter, who sits at trial facing the bench, likewise rejects the argument. Caruso Cert., ¶ 6.

Furthermore, a review of the record reveals that counsel for Barbara Bissell raised the issue of the facial expressions during Nicholas Bissell's testimony. Tr. at 2364. The court denied the off handed allegation, as did Mr. Rabner, counsel for the Government. Significantly, counsel for Nicholas Bissell did not join in Ms. Donnelly's comments. *Id.*

names of therapists and others, psychologists, psychiatrists who might be able to help with counseling." 27 January 1997 Tr. at 39. The Government also stated that funds for treatment were available to the Bissell children from "several paid-up life insurance policies that had hundreds of thousands of dollars worth of death benefits that were valid [and] were in force...." *Id.* at 39, 40.

Nicholas Bissell committed suicide on 25 November 1996. Until now, more than two months since his death, apparently no treatment has been sought on their behalf. 27 January 1997 Tr. at 40. The use of the Bissell children in what appears to be a last minute effort to postpone the incarceration of Barbara Bissell is unfortunate.

### 2. *Bennett's Request*

 As indicated, at argument on 27 January 1997, Bennett requested a stay of execution of Barbara Bissell's sentence so his firm would have the opportunity to become acquainted with the case. This request is rejected.

Barbara Bissell has been represented by privately retained counsel throughout all of the proceedings in the instant case. She has never expressed any dissatisfaction with her chosen counsel. As mentioned, the Motion for Bail Pending Appeal was filed late. The late filing has limited the time available to consider the motion. The late filing, moreover, means that an appeal of the instant decision will likely have to be taken on an emergent basis. The filing of the Supplemental Reply one hour before argument on the Motion for Bail Pending Appeal is likewise problematic. To stay the execution of Barbara Bissell's sentence to allow Barbara Bissell's newly "engaged" attorneys to become familiar with the case would be to reward what appears to be an attempt to simply delay the commencement of Barbara Bissell's sentence.

It was apparent, based upon a totality of the circumstances, including the late entry of newly "engaged" counsel, that the request for a stay of execution of Barbara Bissell's sentence was a calculated attempt to delay the commencement of the sentence. Accordingly, the request was denied.

*Conclusion*

The Motion for Bail Pending Appeal does not present a substantial issue of fact or law warranting continuation of bail pending Barbara Bissell's appeal. Accordingly, the Motion for Bail Pending Appeal is denied. Because the application for a stay of commencement of Barbara Bissell's sentence appears to have been made for the sole purpose of delaying the commencement of sentence, it is also denied.